# SUPREME COURT

OF THE

## STATE OF NEVADA.

## OCTOBER TERM 1885.

[No. 1209.]

### PHILLIPPI MARTIN, Respondent, v. VICTOR MILL AND MINING COMPANY, Appellant.

TESTIMONY—ACCOUNTS—CREDIBILITY OF WITNESSES—BUSINESS RELATIONS OF SUPERINTENDENT AND FOREMAN OF MINE.—The facts of this case involving an accounting between the parties, the business relations of the foreman and superintendent of appellant's mine, and the credibility of respondent's testimony as a witness, stated and reviewed by the court.

MINING CORPORATION—WHEN LIABLE FOR MONEY VOLUNTARILY ADVANCED BY FOREMAN—RATIFICATION.—The foreman of a mining corporation, with the knowledge and acquiescence of the officers of the corporation,—but without any special request,—advanced money to pay the debts of the corporation, and the corporation, with full knowledge of all the facts, acquiesced in the acts of its officers and agents in their dealings with the foreman: Held, that such knowledge and acquiescence amounted to a ratification of the acts of the foreman, and rendered the corporation liable to him for the money so advanced.

CONTRACT—WAGES OF FOREMAN—DISCHARGE OF LABORERS.—Respondent was employed as a foreman of appellant's mine at five dollars per day. Subsequently the mine was shut down, and the laborers discharged. Respondent was requested to remain and watch the mine, without anything being said about a reduction of wages, and he performed such service at the mine as he was requested to do. *Held*, upon a review of the facts, that he was entitled to recover the sum of five dollars per day after the closing of the mine. (Leonard, J., dissenting.)

PAYMENT OF LABORERS BY FOREMAN OF MINE—VOUCHERS AND RECEIPTS ADMISSIBLE IN EVIDENCE.—Where a foreman in a mine, charged with the employment and discharge of laborers in such mine, pays such laborers out of his own funds, in an action against his employer to recover the amounts thus advanced, the time-account of the laborers thus paid by the foreman, and the receipts given by them to him therefor, are admissible in evidence.

APPEAL from the District Court of the Third Judicial District, Esmeralda County.

The facts are stated in the opinion.

*P. Reddy*, for Appellant:

I. The burden of proof of ratification, and all its essentials, rests on the plaintiff. (*Clarke* v. *Lyon Co.*, 7 Nev. 76.)

The person ratifying must be cognizant of the facts. (Whar. on Ag., sec. 65.)

Rhodes, as mining superintendent, had no authority to borrow, or to authorize any one else to do so, and therefore could not, by virtue of his position, ratify such an act. (Stor. on Ag., sec. 69, note 2; Bainb. on M. 379, 380, 382, 383; *Union Gold M. Co.* v. *R. M. N. B.*, 1 Col. 532; *Union Gold M. Co.* v. *R. M. N. B.*, 2 Col. 248; *Breed* v. *N. B.*, 4 Col. 481.)

II. The plaintiff was impeached by his testimony given at the former trial. Such testimony is insufficient to support a verdict or decision. (3 Gra. & Wat. N. T. 1267; *Newell* v. *Wright*, 8 Conn. 319; *Territory* v. *Adolphson*, 5 Mon. 237; *Handly* v. *Call*, 30 Me. 9; *Dunlap* v. *Patterson*, 5 Cow. 243; *Santissima Trindad*, 7 Wheat. 283, 338.)

III. The evidence shows that defendant in good faith paid to A. J. Rhodes every dollar earned by its employees up to the time it ceased operations. It had the genuine receipts of the employees themselves before it. Mining companies, corporations, and individuals who rely upon agents to transact their business, at a distance from the principal's residence, must of necessity and do universally rely upon such evidence.

Argument for Respondent.

Whether these employees knew what Rhodes intended to do with the pay-rolls really makes no difference; they put it in his power to obtain the money, and the question is, Who should suffer? We claim that these facts make out a clear estoppel. (2 Whar. on Ev., sec. 1066; Big. on Es. 429, 430.)

*D. J. Lewis,* *Thomas H. Wells,* and *Curler & Bowler,* for Respondent:

I. This court will not reverse the judgment of the district court on the ground that the evidence is insufficient to justify the findings and decision of said court, if it shall find in the record a conflict of testimony upon the points involved. (*Pinschower* v. *Hanks,* 18 Nev. 99; *Barnes* v. *Sabron,* 10 Nev. 218; *Leport* v. *Sweeney,* 11 Nev. 387; *Smith* v. *Mayberry,* 13 Nev. 427; *McLeod* v. *Lee,* 14 Nev. 389; *Kile* v. *Tubbs,* 32 Cal. 332; *Hardenburg* v. *Bacon,* 33 Cal. 356; *Went* v. *Ross,* 33 Cal. 650; *King* v. *Meyer,* 35 Cal. 646; *Frost* v. *Harford,* 40 Cal. 165; *Witherby* v. *Thomas,* 55 Cal. 9; *Ladd* v. *Samuels,* 57 Cal. 357.)

II. The advances by plaintiff were expended in carrying out the objects for which the defendant might legally incur debts. We apprehend there can be little or no dispute as to the right of plaintiff, or of a person claiming through him, to stand in the place of the original creditors whose demands, being valid claims, have been paid by him. In any event, the advancement by plaintiff for the use and benefit of defendant may be considered as an equitable assignment of the original creditors to the plaintiff of their demands thus paid by him. (*National Bank* v. *Mathews,* 98 U. S. 621; *Zabriskie* v. *C. C. & C. R. R. Co.,* 23 How. 381; *Railroad Co.* v. *Howard,* 7 Wall. 392, 413; *San Antonio* v. *Mehaffy,* 96 U. S. 312; *Mayor* v. *Ray,* 19 Wall. 468.) As to the right to recover, though the contract be *ultra vires,* see *Railway Co.* v. *McCarthy,* 96 U. S. 258; *Hitchcock* v. *Galveston,* 96 U. S. 351, 451; *Gold Mining Co.* v. *National Bank,* 96 U. S. 640; *Macon* v. *Shores,* 97 U. S. 272; *Hotel Co.* v. *Wade,* 97 U. S. 13; *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Zantzinger* v. *Gunton,* 19 Wall. 32; *In re Jacox,* 12 Blatchf. 209; *Stewart* v. *National Bank,* 2 Abb. U. S. 424; *In re Comstock,* 3 Saw. 218; *Bissell* v. *M. S. & N. I. R. R. Co.,* 22 N. Y. 262; *Kelley* v. *People's Trans. Co.,* 3 Or. 99; *Whitman M. Co.* v. *Baker,* 3 Nev. 386; *Union G. M. Co.* v. *Rocky M.*

*Nat. Bank*, 2 Col. 256; *Gas Co.* v. *San Francisco*, 9 Cal. 453; *McCracken* v. *San Francisco*, 16 Cal. 591; *Grogan* v. *San Francisco*, 18 Cal. 590; *Pimental* v. *San Francisco*, 21 Cal. 351; *Satterlee* v. *San Francisco*, 23 Cal. 314; *Argenti* v. *San Francisco*, 16 Cal. 255; *Zottman* v. *San Francisco*, 20 Cal. 96;[1] *Miners' D. Co.* v. *Zellerbach*, 37 Cal. 543, 579;[2] *Foulke* v. *San Diego S. P. R. R. Co.*, 51 Cal. 365.

III.  One cannot stand by and know that another is expending his energy, labor, and funds for his benefit, and then defeat a recovery because the act was not at first authorized.  (2 Greenl. Ev., secs. 107–108, and note; Ang. & Am. Corp., sec. 304; *Union M. Co.* v. *Rocky M. N. B.*, 2 Col. 248, 565; *Breed* v. *First Nat. Bank*, 4 Col. 506.)

The acts, declarations, and admissions of the regularly constituted agents of the defendant, with full knowledge of the payments made by plaintiff, show clearly the obligation of defendant to pay plaintiff the various amounts found by the court.

These payments were made during times when they were actively engaged in conducting the business of the company, and when the subject-matter of this controversy was being contracted, and necessarily become part of the *res gestæ*.  (Sto. on Ag., sec. 134, and note 2; *Garfield* v. *K. F. W. Co.*, 14 Cal. 35; *Neely* v. *Naglee*, 23 Cal. 152; Sto. on Ag., secs. 85, 86, 96, 97; *Horton* v. *Morgan*, 19 N. Y. 170;[3] *Warren* v. *Mason*, 18 Wend. 434.)

IV.  The failure of defendant to object to plaintiff's account must be treated as an admission and acquiescence by it in the correctness of said account.  (*Murray* v. *Toland*, 3 Johns. Ch. 569; *Freeland* v. *Heron*, 7 Cranch, 147; 1 Story Eq. Jur., secs. 526, 528.)

V.  Rhodes being superintendent, and also a director of the corporation, was incapacitated from accepting an assignment from any creditor of the defendant for his own use and benefit; nor could he purchase or deal with the subject-matter of this suit for his own benefit.  (Sto. Eq. Jur., secs. 321–322; *Conger* v. *Ring*, 11 Barb. 356; *Davoue* v. *Fanning*, 2 Johns. Ch. 252; *Vanhorn* v. *Fonda*, 5 Johns. Ch. 409; *Parkist* v. *Alexander*, 1 Johns. Ch. 397; 4 Kent Com. 475; 1 Sto. Eq. Jur., sec. 322; *Ex parte James*, 8 Ves. 337; *Page* v. *Naglee*, 6 Cal. 241; Sto. on Ag., sec. 211.)

[1]  81 Am. Dec. 96.      [2]  99 Am. Dec. 300.      [3]  75 Am. Dec. 311.

VI. The defendant by its acquiescence and by the letters of Coye and Rhodes, and by the fact of the examination of the book of plaintiff's accounts against it, and the admission of the officers of the correctness of plaintiff's account and its repeated promises to pay, must be deemed to have ratified the actions of plaintiff, which is equivalent to a previous request. (Ang. & Am. on Cor., sec. 305; *Lawrence* v. *Tucker*, 7 Greenl. 195; *Pittsburg Bank* v. *Whitehead*, 10 Watts, 397; *Boggs* v. *Lancaster Bank*, 7 Watts, 331; *Conro* v. *P. H. I. Co.*, 12 Barb. 27; *Cumberland C. & I. Co.* v. *Sherman*, 30 Barb. 553; *McEwen* v. *Montgomery C. M. I. Co.*, 5 Hill, 101; Sto. Ag., sec. 140; Paley on Ag. 262, 266; Sto. on Ag., secs. 140, 451; Wade Law of Not., sec. 672; Green's Brice's Ultra Vires, 500.)

By the Court, HAWLEY, J.:

The amended complaint in this action contains two counts. The first is for two thousand two hundred and twenty-four dollars, upon a stated account as settled May 4, 1878. The second is for an alleged indebtedness of twenty thousand two hundred and seventy-three dollars and twenty-eight cents, itemized as follows: Two thousand dollars money had and received by defendant from plaintiff on October 25, 1879; ten thousand and seventy-two dollars for money paid out and expended by plaintiff for the use and benefit of defendant; three hundred and twenty-one dollars for tools, materials in building house, office expenses, powder and taxes; three hundred and forty-three dollars and sixty cents judgments in justice's court against defendant paid by plaintiff; seven thousand five hundred and thirty-five dollars for one thousand five hundred and seven days' work and labor as foreman of the defendant at five dollars per day. There is an admitted credit of ten thousand three hundred and twenty dollars and forty-six cents, and the suit is brought to recover an alleged balance of twelve thousand one hundred and seventy-six dollars and eighty-two cents. The answer specifically denies each and every allegation in the complaint, and generally denies any indebtedness whatever. The cause was tried before the court, without a jury, and plaintiff recovered a judgment for five thousand seven hundred and sixty-two dollars and nine cents. Defendant appeals, and contends

that the evidence is insufficient to support the findings and judgment.

Before reviewing the specific items it becomes necessary to consider some of the peculiar facts of this case, which bear more or less upon each of the several items of the account. Respondent was the foreman of appellant's mine for several years. He was regularly employed, and was to be paid for his services at the rate of five dollars per day. He also kept a boarding-house, where the laborers employed at the mine boarded. A. J. Rhodes was the superintendent of the mine, and a large owner therein. He was also engaged in the general business of merchandising. Respondent bought most of his supplies at Rhodes's store. The question whether appellant is indebted to respondent in any of the amounts stated depends, to a great extent, upon the nature of the business relations existing between respondent and Rhodes. The theory of appellant is, and the testimony offered in its behalf tends to show, that respondent's accounts against appellant were transferred or turned over to Rhodes, and that Rhodes had been paid in full by appellant. The theory of respondent is, and his testimony tends to show, that he only turned over these accounts to Rhodes so as to cover the extent of his indebtedness to Rhodes, and that the understanding was, that appellant was to be responsible for the balance due him, and that the same had never been paid.

When this case was first presented to this court, there was no controversy as to the manner in which the business transactions between respondent and Rhodes were conducted. (*Martin v. Victor M. & M. Co.*, 18 Nev. 306.) But the testimony as now presented upon this point is different in many of its phases from that contained in the former record. Appellant, however, contends that the facts to be gleaned from the present record are substantially the same as in the former, especially as to the business relations between respondent and Rhodes. This position is sought to be maintained by a direct attack upon the veracity of respondent, it being claimed that no credit should be given to his testimony. It is argued that his testimony on the last trial " is self-contradictory and self-nullifying," and that he stands before this court " self-convicted of falsehood." It is claimed that his testimony, upon all the material matters,

is in direct conflict with his testimony at the first trial, and it is charged that he was induced to make this change in his testimony on account of the previous decision of this court. There are many statements made in his cross-examination which are to some extent contradictory of his testimony in chief; and some portions of his testimony in chief are shown to be at variance with his testimony upon the same points at his former trial. But after a careful examination of the entire record, we are unwilling to say that his testimony is unworthy of belief, or that in our opinion there is anything in the record to show that he has knowingly or willfully testified falsely in relation to any of the items of account. We think that his contradictory statements are to be accounted for by the peculiar complications arising from his business transactions with Mr. Rhodes, and by a failure upon his part to fully comprehend the nature of some of the questions asked him upon a tedious, searching, and ingenious cross-examination, rather than upon any intentional design to misrepresent any of the facts. In considering his testimony it must be remembered that appellant's affairs were so blended and mixed up with the business transactions of its superintendent and foreman that it was difficult for counsel, and by no means easy for this court, to explain the relations existing between them. The entire business between all of these parties seems to have been conducted in a loose, careless, and unsatisfactory manner. No regular books were kept by the superintendent. He took the vouchers, pay-rolls, and bills given to him by the foreman, and sent them to the office of appellant in San Francisco, California. The foreman kept books; but, judging him by the record before us, he is not a success as a book-keeper. He was, however, for six years the trusted friend and adviser of appellant. In him at all times it reposed the utmost confidence. He was considered and treated as an honest, worthy, faithful, and confidential employee, and, as such, was intrusted with the management and control of appellant's mining property to a great extent. as the superintendent was seldom at the mine.

The question whether the superintendent kept any books, or whether appellant had any office at Belleville, is made the subject of attack upon the veracity of respondent, and furnishes an illustration of the conflict which exists between his testimony and the testimony of Mr. Rhodes. The facts are, that

appellant had no office specially designated as such by signs
or other outward marks. It conducted its business, through its
superintendent, in a room at his store. This room was also his
private office, and in which he kept his store books. Respond-
ent testifies that this room was appellant's office, and that its
books were kept there. On the other hand, Rhodes testifies
that appellant had no office, and kept no books. Respondent
claims, upon this point, to have been deceived by Rhodes, and
the result of the testimony seems to be that, as to some of the
accounts, the respondent thought he was getting credit on
appellant's books, when in fact the entries were made in the
store books kept by Mr. Rhodes. It is, however, immaterial
whether the books in which the entries were made were the
books of Rhodes, or the books of appellant. The controlling
question is, whether appellant was to be liable to the foreman
for the balance of his account, over and above the amount due
from him to Rhodes; or was it the understanding that he was
to look to Rhodes for his pay?

Appellant had knowledge of the manner in which its business
was conducted. It appears from the record that appellant was
advised from time to time of the state of its accounts with
respondent. For a period of four years after Rhodes closed
his store the president of appellant, at various times, writes to
respondent with reference to his accounts, making excuses for
the delay in paying him, and promising to pay him as soon as
appellant realizes any money from the sale of its property.
The superintendent spent much of his time in San Francisco.
He was one of the directors of the corporation. The president
was also a director. They were working together, and had
each other's confidence in the business of the corporation. In
relation to the question whether the corporation was indebted
to respondent or not, we take the following extracts from the
letters of the president of the corporation to respondent, which
were written subsequent to the time of the closing of Rhodes's
store in April, 1880: June 24, 1880: "I received Mr. Kim-
ball's letter, written at your request, and will state that in a
short time I will get matters arranged so as to settle off with
the men, and keep them paid up promptly, and you will get all
your money. It is perfectly safe." May 19, 1881: "As to
your account, you may rest at ease; both McCain and myself
assure you that as soon as a sale is made, and the money paid,

the debts will be paid first of all, before the stockholders get a dollar."

It does not affirmatively appear who McCain is, but it is fair to presume, from the frequent reference to his name in connection with the president's, in efforts made to assist and protect Rhodes, that it is James S. McCain, whose name appears as one of the directors of the corporation.

June 10, 1881:—

"Your letter received. * * * Now, I want a statement of your account in full against the company; also a full account of the men that have been employed in the mine since July, 1879. I want the pay-rolls of each month by themselves, and the men that you have paid. State it and *make out a bill against the company as paid by you.* * * * I think this will be a sale, and *you will get all your money soon.*"

July 12, 1881:—

"Your letter of the seventh received. * * * As to the account, we have it all written out in shape, and will soon get the balance. That two thousand dollars charged as cash to Victor, you did not say what it was for, but we will work it out. I told the secretary that you used it to pay off the men, and that you held their notes for it, and when you come here for a settlement *you will present them all for payment.* Your not giving a list of those you paid money to makes it harder for us to work out. We take the full pay-rolls, deduct your own, and then find balance due, and if balance is paid we credit you. * * * If you charge us the two thousand dollars and the order also, you will get the amount in twice. We will get it right and send it to you, and *you will get all your money from the company.* I will show the account to Mr. Rhodes as soon as I get it out straight, and tell him that you want the settlement with the Victor Company."

Next follows the letter reported in 18 Nev. 303, dated July 13, 1881.

September 1: "Your letter of the thirtieth received, and I note all you say. First, about your account. *I promised you that the company should stand good to you for that; and that you can depend on.*"

April 14, 1882: "Your letter of April 10 this day received. I have read it all, and note all you say. I note your remarks about the Kline matter, and that I always have money. * *

* You know * * * that we have done all in our power to pay all. * * * We sold the property, and the money was to come for it. I did not put up money, not a dollar, in the Kline matter; but it was put up by friends of the company. * * * It was impossible for me to send you any money. * * * *I do not forget my promise to you as to your account, and I understand all about it.* The money is promised by the fifteenth to pay everything up. When it comes you will be paid. * * * You have been the trusted man of the company, and I hope and trust that you will do all you can to help us through our troubles, and not make us more."

May 31, 1884: "Your letter received. * * * I am trying to get some money to send you. * * * I told Mr. Rhodes that it was too bad that you was treated so after standing by us as you had done."

On the twenty-second of March, 1881, Mr. Rhodes writes a letter to respondent, which also sheds some light upon the disputed question of any indebtedness. "Yours in hand. As regards my saying that the Victor did not owe you any money, you can tell those parties that it is a lie. I have never told any one anything of the kind. It is their own manufactory, and I don't think they ever heard any one say so; and if they and their kind would hold their tongues, we would have had money for you long ago."

These letters explain themselves. We shall, therefore, proceed upon the theory that appellant is indebted to respondent in some amount, and that his testimony should be taken into consideration in determining the disputed questions at issue between these parties.

A general objection is made to the allowance of any of the accounts for money advanced or paid out by respondent for appellant's use and benefit, on the grounds that there is no evidence showing, or tending to show, that appellant ever requested him to advance or pay out any money for its use or benefit; that the payments, if made, were made gratuitously; that no officer of appellant was authorized to request any one to advance money in its behalf, or to sanction or ratify the acts of respondent; and that his acts, in this respect, were never ratified by appellant. Appellant, in its business transactions of the nature revealed by the testimony in this case, must be treated the same as an individual engaged in like business. If

its duly authorized officers or agents acting for it had knowl-
edge of, sanctioned, and ratified the acts of respondent in
advancing money for its use and benefit, and appellant, with
full knowledge of all the transactions, acquiesced in the acts
and declarations of its officers and agents in their dealings with
respondent, it should be held liable for the money so advanced
by respondent. It cannot, under such circumstances, avoid
this liability, on the ground that such a course of proceedings
was never authorized by its directors. It is made manifest
from the testimony that appellant had knowledge of the
advances of money in its behalf by respondent. It received
the benefit of these advances without protest or objection, and,
through its officers, repeatedly informed respondent that it
would be made " all right," and that he should be repaid as
soon as it could obtain the money. Respondent, among other
things, testified as follows: "Many times I spoke to Mr.
Rhodes of the money I had advanced to the men for the
company. Mr. Rhodes said it was all right, and that I would
be paid for the money I had thus advanced."

Similar testimony was given in relation to each account
where it is claimed advances were made.

On the twentieth of June, 1881, the president writes to re-
spondent, and says: "Yours, with pay-rolls and letter received.
The balance of your account, October 25, 1879, ten thousand
sixty-eight dollars and five cents, I cannot get at for books of
company. *I think you had better send me your books by express.*"

On the twenty-third of June, 1881, another letter is written
stating: "In sending for your books the other day, I should
have stated more fully why I wanted them.   *   *   *   I wanted
a full detailed statement to put on the books of the company,
and *place your account to your credit on the books,* so that the
money, when paid for the mine, if sold, can be paid out with-
out delay. *You can arrange to have yours paid just as you like.*"

On the first of July the president acknowledges the receipt
of respondent's books. In August following, the respondent,
as he testifies, had a conversation with the president and super-
intendent of appellant in San Francisco, and in reply to his
request for a settlement, told him to go with the secretary of
appellant, examine the accounts, and find the balance, and
said "that everything that was done between the secretary and
myself would be all right"; that the secretary and respondent

examined the books and accounts, and found a balance to be due respondent "of some ten or eleven thousand dollars"; and that all the accounts sued for were in the books which they examined. In the light of all the testimony, we are of opinion that appellant must be held liable for the amounts of money which respondent at various times advanced for its use and benefit.

There is sufficient evidence to sustain the finding of the court allowing respondent two thousand two hundred and twenty-four dollars upon the first count in the complaint. Respondent testified as follows: "I had a settlement with A. J. Rhodes, the superintendent of the company, on the fourth day of May, 1878, and a balance of two thousand two hundred and twenty-four dollars was admitted to be due me. * * * The balance of two thousand two hundred and twenty-four dollars was never paid to me by defendant or any one in its behalf."

We deem it unnecessary to discuss the controversy arising from the evidence as to when this account commenced, there being an admitted mistake of one year in the first statement of respondent, and in the entry made in the books kept by him, which was corrected at the first trial upon his cross-examination, further than to state that it does not affirmatively appear that there was any intentional design upon the part of respondent to make any demand for an extra year's service, as claimed by appellant.

The evidence sustains the finding of the court allowing the two-thousand-dollar account. Respondent testified that he paid this money to the men; but when called upon to name the men and the amounts paid to each, he only showed a cash payment of about eight hundred and seventy-five dollars, and it is claimed that no more than this amount should, in any event, have been allowed. The record shows that the corporation was indebted to the men in the full amount. The men were indebted to respondent for board, and for cash previously advanced to them. In respondent's testimony he says: "I paid the money myself to the men in coin checks of different amounts. * * * The men owed me board bills and cash, besides, furnished to them, both for account of the company. I bring the men down to Rhodes. Mr. Rhodes had no money, and the company had no money. I furnished two thousand dollars." The reasonable conclusion to be drawn from this testimony

is, that in furnishing this money he included the amounts due from the men to himself for board, and money previously advanced, and that it was the balance which he paid in coin checks to the men.

The court only allowed seventy-six dollars of the three hundred and twenty-one-dollar account, and no objection is made to this. The account of three hundred and forty-three dollars and sixty cents allowed by the court is objected to upon several grounds. It is claimed that it does not affirmatively appear that the judgments were regularly entered. This is immaterial. If it appears that respondent paid this money upon appellant's request, or that having paid it without request, appellant subsequently ratified the act and promised to pay respondent the money, it cannot avoid the payment on account of any irregularity in the proceedings in the justice's court, or in the proofs as to the existence of the judgments. The record shows that respondent paid these judgments, and the court's finding in this respect is fully sustained by the testimony.                                        ✦

The court allowed respondent six thousand nine hundred and seventy-five dollars for one thousand three hundred and ninety-five days' work, at five dollars per day. As the mine was closed down on the eleventh of October, 1880, it is contended that respondent is not entitled to any wages as foreman after that date; that he is not, in fact, entitled to any wages; but if any amount is allowed, it should be for a smaller sum than five dollars per day.

Respondent relies upon the original agreement, upon the request of appellant for him to remain and watch the mine and property, and the further fact that no notice was ever given to him that his services were not needed, or anything said about a reduction of his wages. The original agreement was, that he should receive " five dollars per day right along, whether the mine paid or not." Respondent claims that he was recognized as foreman until 1882.

Rhodes, on behalf of appellant, testified that when the mine was closed down in 1880, he had a conversation with respondent, and "told him we could not keep a foreman there at that time. We both agreed that it was not right to keep a foreman there under wages; that he was to stop there, and he could stop in the Victor House without charge." When asked to repeat the

conversation he said: "I told him that the company could not afford to pay a man wages for staying there. He agreed to it; stated that he would stop there at the mine, and that there would not be any charge for it." Respondent, when questioned by appellant's counsel, gave his version of the conversation with Rhodes as follows : " *Question.* What did he (Rhodes) say to you? *Answer.* I asked him if he wanted me to stay there and take care of the property. They expected to have everything settled and start anew in a very short time. *Q.* Is it not a fact that he told you to stay in the boarding-house and take care of it, and when they would start up again they would want you? *A.* No, sir."

He gave other testimony of like import. It affirmatively appears that he was frequently ordered by the president and superintendent to perform service at the mine, and that he complied with their requests.

We are of opinion that the court was justified, if it believed respondent's testimony to be true, to allow him five dollars per day for the time claimed after the mine was closed down. There is, however, a mistake in the computation of time. The whole number of days between May 4, 1878, and June 12, 1882, is one thousand four hundred and ninety-nine, and from this should be deducted one hundred and eighteen days that respondent admits being absent from the mine, leaving one thousand three hundred and eighty-one days, which, at five dollars per day, amounts to six thousand nine hundred and five dollars.

Of the ten thousand and seventy-two dollars claimed by respondent as having been paid to the men employed at the mine, the court only allowed about six thousand dollars. With reference to this claim, the respondent testified that he knew the corporation was indebted to the men in the several amounts paid by him, because he, as foreman, was authorized to employ and discharge the men, and that they could not receive pay for their labor without first obtaining a time-check from him; that the corporation failed to pay the men, and that he paid them with his own money. He also introduced vouchers for the amounts, which the court allowed. The greater portion of these vouchers were simply in the form of an account for so many days' labor against appellant, regularly receipted. Some

were regular receipts acknowledging the receipt of the money from respondent " on account of labor performed for Victor Mill & Mining Company." It is argued that the first class of vouchers were immaterial, irrelevant, and inadmissible in evidence, as they did not tend to prove that the money received was not paid by appellant; and that the other class, as to the labor being performed for appellant, were to that extent " a self-serving statement and hearsay evidence." We are of opinion that all the vouchers produced by respondent were properly admitted in evidence, as they tended to corroborate his testimony that he had paid these accounts with his own money. In connection with some of these accounts, it is claimed that appellant was misled and deceived by the acts of respondent, and the men at work under him, in signing the monthly pay-rolls and delivering the same to the superintendent, without receiving their money for the wages receipted for, and it is argued that respondent is for this reason estopped from asserting that the amounts of money as specified in these pay-rolls was never paid by appellant. It is not shown that there was any collusion or intended fraud upon the part of respondent in relation to this matter. The evidence is, that the pay-rolls were receipted for at the special instance and request of the superintendent. Respondent testified as follows: " I signed myself, and some other parties signed the pay-rolls, at the instance and request of Rhodes, the superintendent.   *   *   *   He insisted to have the pay-rolls signed. He said it would be all right. I said, ' Mr. Rhodes, that is not the way to do.   *   *   * '   He said that would be all right; the company was good for it; the mine was good for it."

If there was any misconduct, it was upon the part of appellant's superintendent, and if it was misled thereby, we do not think the respondent should be held responsible for the acts of the superintendent. But we are of opinion that the record shows that appellant had knowledge of the methods used in procuring the signatures of the foreman and laborers upon the pay-rolls, and that it was not misled, deceived, or injured in this matter.

It is contended that the court erred in allowing respondent four hundred and ninety-two dollars, which he paid to Nicholas Kline. It appears that Kline subsequently commenced suit for the balance due him from the corporation, and in his complaint

admitted that he had received from appellant "the sum of four hundred and ninety-two dollars for boarding, and the sum of two hundred dollars in cash." Respondent, after testifying that he had paid this four hundred and ninety-two dollars, offered the following receipt as a voucher to show that he had advanced this amount to Kline:—

"$492.                    CANDELARIA, September 2, 1880.

Received from P. Martin four hundred and ninety-two dollars on account of labor performed for Victor Mill & Mining Company.                    NICHOLAS KLINE."

Appellant objected to this receipt "on the ground that it was immaterial and irrelevant, and that plaintiff is estopped from offering the evidence of any payment by him to said Kline by reason of the judgment roll already in evidence in the case of *Kline* v. *Victor Mill & Min. Co.*, for the reason that it is there adjudicated that defendant had paid four hundred and ninety-two dollars for board of said Kline, and the sum of two hundred dollars in cash, and the further sum of sixty-nine dollars and ninety cents, the board of said Kline, making a total of seven hundred and sixty-one dollars and ninety cents. A judgment for the balance of all that he had earned to that time, the sum of one thousand two hundred and eighty-two dollars and ten cents, was, on the twenty-fourth of June, 1881, rendered in favor of said Kline for said amount, which sums included, as adjudicated in said judgment, the entire amount of the earnings of said Kline from said defendant; * * * and the receipt is contradictory of the judgment, in that it is there asserted that four hundred and ninety-two dollars was paid by P. Martin on account of labor performed for the Victor Mill & Mining Company; whereas, *said judgment determined that it was paid by defendant.*"

The position of appellant, as claimed by this objection, is that, notwithstanding the fact that this money was paid by respondent, he is estopped from recovering it because Kline gave appelant c'ed't therefor. This objection is wholly untenable.

It is claimed that the court erred in allowing the sum of four hundred dollars which respondent, in his examination in chief, testified he had paid to T. Plameney. In his cross-examination he gave testimony to the effect that he only paid Plameney three hundred and ninety dollars, and it is contended that this is all that should have been allowed. But it appears that

respondent, in testifying to the payment of the sum of four hundred dollars, included a store account of Plameney for ten dollars, and in relation to this account, upon his cross-examination, said: " I fixed this thing with the store-keeper about the ten dollars."

An objection is urged against the allowance of the sum of three hundred and six dollars paid to B. McMurray, and it is claimed that this allowance should be reduced to two hundred and twenty-five dollars, which respondent paid out and obtained credit for upon Rhodes's books. The amounts which respondent obtained credit for on Rhodes's books varies from the real amount paid in many cases. In relation to this claim, respondent offered in evidence a receipted account from McMurray for three hundred and six dollars, for seventy six and one half days' labor performed for the Victor M. & M. Co., "which plaintiff testified was due from defendant to said McMurray, and was paid by said plaintiff to McMurray with plaintiff's own money."

There are divers and sundry other objections to the rulings of the court in admitting testimony, and in the allowance of the accounts, of which we deem it unnecessary to make special mention. It is enough to say that we have carefully examined the same, and find them to be without any substantial merit. There being a direct conflict of evidence upon all the material points, it is our duty to sustain the findings of the court.

The judgment of the district court is modified by deducting therefrom the sum of seventy dollars, and, as so modified, the judgment of the district court is affirmed, with costs.

LEONARD, J., dissenting:

I think the court erred in allowing five dollars a day from and after work was suspended in the Victor mine. Giving to respondent's testimony all that the language imports, it amounts to this: That he was originally employed to act as foreman at five dollars a day; that when the company ceased work he was not formally discharged, and while staying in the company's house free of charge, when asked by the president, by letter, he sometimes performed trifling services, which any friend might well do for another. On the contrary, Mr. Rhodes, defendant's superintendant, subsequently testified that when the mine was closed he had a conversation with respondent in

relation to this matter; that he told respondent the company could not afford to keep a foreman or pay a man for staying there; that respondent agreed to it, and stated that he would stop at the mine, and would not charge for it.  Respondent did not contradict Rhodes's testimony; and the trifling services performed by him—such as showing a few visitors about the mine —were such as any person ought to have done, situated as he was, after agreeing with Rhodes that he would remain without compensation until work should be resumed.  Before Rhodes gave his testimony, respondent testified that when the mine was closed, Rhodes asked him if he wanted to stay there and take care of the property, the Victor mine, and that it was not a fact that Rhodes told him to stay in the boarding-house and take care of it, and when work should be resumed the company would want him.  After respondent rested, Rhodes testified for appellant as above stated.  In rebuttal respondent did not deny that he had entered into the agreement stated by Rhodes, and to my mind his former testimony did not amount to such denial.